**FILED**

October 29, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ AM
                              DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

| | |
|---|---|
| **Oscar Orona***, et al.,* | **Case No. 2:24-cv-00049-AM** |
| *Plaintiffs,* | |
| **v.** | **PLAINTIFFS' RESPONSE TO** |
| | **DEFENDANTS' GARCIA, SMITH,** |
| **CHRISTOPHER KINDELL, et al.,** | **SIMPSON, AND FERNANDEZ'S** |
| | **MOTIONS TO DISMISS** |
| *Defendants.* | |

## <u>PLAINTIFFS' RESPONSE TO DEFENDANTS' GARCIA, SMITH, SIMPSON, AND FERNANDEZ'S MOTIONS TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 6

ARGUMENT ..................................................................................................................... 13

I.      LEGAL STANDARD ............................................................................................ 13

II.     PLAINTIFFS HAVE ASSERTED CONSTITUTIONAL CLAIMS ENFORCEABLE
        UNDER SECTION 1983. ..................................................................................... 15

        A.    Plaintiffs Have Stated Due Process Claims Because Defendants Created a
              "Special Relationship" Affirmatively Restraining Plaintiffs' Personal
              Liberty. ...................................................................................................... 15

        B.    Plaintiffs Have Also Stated Substantive Due Process Claims Under the
              State-Created Danger Doctrine. ................................................................ 19

        C.    Plaintiffs Have Stated a Fourth Amendment "Seizure" Claim. ............... 23

III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......................... 25

        A.    Defendants Violated Clearly Established Law. ........................................ 26

        B.    The Doctrine of Qualified Immunity Lacks Legal Basis ......................... 31

IV.     PLAINTIFFS HAVE SUFFICIENTLY PARTICULARIZED THE LEGAL LIABILITY
        OF EACH DEFENDANT. ...................................................................................... 32

        A.    Defendants Overlook Key Facts and Legal Principles Establishing the
              Liability of Each Defendant. .................................................................... 32

        B.    Plaintiffs' Specific Allegations Establish the Liability of Each Defendant. .......... 36

V.      DEFENDANTS' REMAINING ARGUMENTS LACK MERIT. ..................................... 37

        A.    Parent Plaintiffs Have Standing to Pursue Their Claims. ........................ 37

CONCLUSION ................................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Aguirre v. City of San Antonio*,
　995 F.3d 395 (5th Cir. 2021) ................................................................................................ 42

*Anderson v. Creighton*,
　483 U.S. 635 (1987) ............................................................................................................... 28

*Ashcroft v. al-Kidd*,
　563 U.S. 731 (2011) .......................................................................................................... 4, 31

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ............................................................................................................... 14

*Babb v. Dorman*,
　33 F.3d 472 (5th Cir. 1994) ................................................................................................... 14

*Baxter v. Bracey*,
　140 S. Ct. 1862 (2020) ........................................................................................................... 32

*Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*,
　520 U.S. 397 (1997) ............................................................................................................... 45

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ............................................................................................................... 14

*Breen v. Texas A&M Univ.*,
　485 F.3d 325 (5th Cir. 2007) ................................................................................................. 22

*Breen v. Texas A&M Univ.*,
　494 F.3d 516 (5th Cir. 2007) ................................................................................................. 22

*Brosseau v. Haugen*,
　543 U.S. 194 (2004) ............................................................................................................... 28

*Bustos v. Martini Club Inc.*,
　599 F.3d 458 (5th Cir. 2010) ................................................................................................. 22

*Butera v. District of Columbia*,
　235 F.3d 637 (D.C. Cir. 2001) .............................................................................................. 20

*City of Canton, Ohio v. Harris*,
　489 U.S. 378 (1989) ............................................................................................................... 45

*Cole v. Carson*,
　935 F.3d 444 (5th Cir. 2019) .......................................................................................... 15, 28

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ............................................................................................................... 26

*Croft v. Perry*,
    624 F.3d 157 (5th Cir. 2010) ............................................................................................... 43

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) ................................................................................................ 16, 18, 20, 31

*Diaz v. Cantu*,
    2024 WL 489443 (W.D. Tex. Feb. 5, 2024) ........................................................................ 34

*Dixon v. Alcorn Cnty. Sch. Dist.*,
    499 F. App'x 364 (5th Cir. 2012) ........................................................................................ 22

*Doe ex rel. Magee v. Covington Cnty. School Dist. ex rel. Keys*,
    675 F.3d 849 (5th Cir. 2012) .......................................................................................... 19, 22

*Doe v. Hillsboro Indep. Sch. Dist.*,
    113 F.3d 1412 (5th Cir. 1997) ............................................................................................. 18

*Doe v. Lorena Indep. Sch. Dist.*,
    2024 WL 2855487 (W.D. Tex. May 24, 2024) .................................................................... 47

*Doe v. Rosa*,
    795 F.3d 429 (4th Cir. 2015) ............................................................................................... 20

*Doe v. Sch. Bd. of Ouachita Par.*,
    274 F.3d 289 (5th Cir. 2001) ............................................................................................... 43

*Doe v. Taylor Indep. Sch. Dist.*,
    15 F.3d 443 (5th Cir. 1994) ...................................................................................... 27, 45, 47

*Does 1-7 v. Round Rock Indep. Sch. Dist.*,
    540 F.Supp. 2d 735 (W.D. Tex. 2007) ................................................................................ 43

*Est. of Lance v. Lewisville Indep. Sch. Dist.*,
    743 F.3d 982 (5th Cir. 2014) ............................................................................................... 23

*Glasgow v. Nebraska*,
    819 F.3d 436 (8th Cir. 2016) ............................................................................................... 20

*Griffith v. Johnston*,
    899 F.2d 1427 (5th Cir. 1990) ........................................................................................ 17, 19

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ............................................................................................................. 15

*Hicks-Fields v. Harris Cnty.*,
   860 F.3d 803 (5th Cir. 2017) ............................................................................................... 44

*Hoggard v. Rhoades*,
   141 S. Ct. 2421(2021)............................................................................................................ 32

*Hope v. Pelzer*,
   536 U.S. 730 (2002).........................................................................................................passim

*Hughes v. Garcia*,
   100 F.4th 611 (5th Cir. 2024) .............................................................................................. 33

*Irish v. Fowler*,
   979 F.3d 65 (1st Cir. 2020)................................................................................................... 20

*Jackson v. Indian Prairie Sch. Dist. 204*,
   653 F.3d 647 (7th Cir. 2011) ................................................................................................ 20

*James v. Texas Collin Cnty.*,
   535 F.3d 365 (5th Cir. 2008) ................................................................................................ 33

*Johnson v. Dallas Indep. Sch. Dist.*,
   38 F.3d 198 (5th Cir. 1994) .................................................................................................. 22

*Kallstrom v. City of Columbus*,
   136 F.3d 1055 (6th Cir. 1998) .............................................................................................. 20

*Kemp v. City of Houston*,
   2013 WL 4459049 (S.D. Tex. Aug. 16, 2013) ....................................................................... 24

*Kisela v. Hughes*,
   584 U.S. 100 (2018).............................................................................................................. 33

*Kneipp v. Tedder*,
   95 F.3d 1199 (3d Cir. 1996) ................................................................................................. 20

*L.S. ex rel. Hernandez v. Peterson*,
   982 F.3d 1323 (11th Cir. 2020) ............................................................................................ 19

*Landry v. Cypress Fairbanks ISD*,
   2018 WL 3436971 (S.D. Tex. July 17, 2018) ....................................................................... 42

*Littlefield v. Forney Indep. Sch. Dist.*,
   268 F.3d 275 (5th Cir. 2001) ................................................................................................ 43

*Luevano v. Geyer*,
   2009 WL 10700090 (W.D. Tex. Feb. 23, 2009)....................................................... 20, 21, 23

*Malley v. Briggs,*
    475 U.S. 335 (1986)................................................................................................ 4, 30

*Matthews v. Bergdorf,*
    889 F.3d 1136 (10th Cir. 2018) ............................................................................... 20

*McClendon v. City of Columbia,*
    305 F.3d 314 (5th Cir. 2002) .................................................................... 16, 23, 31

*McKinney v. Irving Indep. Sch. Dist.,*
    309 F.3d 308 (5th Cir. 2002) ................................................................................... 21

*McLin v. Ard,*
    866 F.3d 682 (5th Cir. 2017) ................................................................................... 24

*Michigan v. Chesternut,*
    486 U.S. 567 (1988).................................................................................................. 24

*Morgan v. Swanson,*
    659 F.3d 359 (5th Cir. 2011) ................................................................................... 31

*Morin v. Moore,*
    309 F.3d 316 (5th Cir. 2002) ............................................................................. 21, 23

*Newman v. Guedry,*
    703 F.3d 757 (5th Cir. 2012) ................................................................................... 28

*Okin v. Vill. of Cornwall-On-Hudson P.D.,*
    577 F.3d 415 (2d Cir. 2009) .................................................................................... 20

*Parham v. J. R.,*
    442 U.S. 584 (1979).................................................................................................. 43

*Pearson v. Callahan,*
    555 U.S. 223 (2009)........................................................................................... 15, 31

*Peña v. City of Rio Grande City,*
    879 F.3d 613 (5th Cir. 2018) ................................................................................... 44

*Pineda v. City of Houston,*
    291 F.3d 325 (5th Cir. 2002) ................................................................................... 43

*Quilloin v. Walcott,*
    434 U.S. 246 (1978).................................................................................................. 42

*Rhyne v. Henderson Cnty.,*
    973 F.2d 386 (5th Cir.1992) .................................................................................... 44

*Rios v. City of Del Rio, Tex.*,
    444 F.3d 417 (5th Cir. 2006) ............................................................................................. 22

*Robertson v. Wegmann*,
    436 U.S. 584 (1978) ........................................................................................................... 41

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) ............................................................................................. 32

*Rynearson v. United States*,
    2013 WL 11309342 (W.D. Tex. Sept. 30, 2013) ................................................................ 28

*Saenz v. City of McAllen*,
    396 F. App'x. 173 (5th Cir. 2010) ...................................................................................... 31

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ........................................................................................................... 43

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) ............................................................................................. 22

*Schydlower v. Pan Am. Life Ins. Co.*,
    231 F.R.D. 493 (W.D. Tex. 2005) ...................................................................................... 14

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ........................................................................................................... 42

*Taylor v. Riojas*,
    592 U.S. 7 (2020) ......................................................................................................... 28, 29

*Terry v. Ohio*, 392 U.S. 1 (1968) ........................................................................................... 24

*Thompson v. Upshur Cnty.*,
    245 F.3d 447 (5th Cir. 2001) ............................................................................................. 45

*Torres v. Madrid*,
    592 U.S. 307 (2021) ........................................................................................................... 24

*Tyson v. Sabine*,
    42 F.4th 508 (5th Cir. 2022) ......................................................................................... 28, 29

*United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) ........................................................................................................... 32

*Valle v. City of Houston*,
    613 F.3d 536 (5th Cir. 2010) ............................................................................................. 43

*Vielma v. Gruler*,
    347 F. Supp. 3d 1122 (M.D. Fla. 2018),
    aff'd, 808 F. Appp'x 872 (11th Cir. 2020) ............................................................................ 19

*Walker v. Livingston*,
    381 F. App'x. 477 (5th Cir. 2010) ......................................................................................... 31

*Walton v. Alexander*,
    20 F.3d 1350 (5th Cir. 1994),
    on reh'g en banc, 44 F.3d 1297 (5th Cir. 1995) ............................................................. 17, 18

*Whitley v. Ariaz*,
    2009 WL 10705391 (N.D. Tex. Mar. 25, 2009)..................................................................... 47

*Whitley v. Hanna*,
    726 F.3d 631 (5th Cir. 2013) ................................................................................................. 33

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)................................................................................................................ 42

*Wood v. Ostrander*,
    879 F.2d 583 (9th Cir. 1989) ................................................................................................. 20

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)................................................................................................................ 16

*Yumilicious Franchise, L.L.C. v. Barrie*,
    819 F.3d 170 (5th Cir. 2016) ................................................................................................. 14

*Zadeh v. Robinson*,
    928 F.3d 457 (5th Cir. 2019) ................................................................................................. 30

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)................................................................................................................ 33

**Statutes**

42 U.S.C. § 1983................................................................................................................... passim

42 U.S.C. § 1988......................................................................................................................... 41

Civil Rights Act of 1871 ............................................................................................................. 32

**Regulations**

Tex. Civ. Prac. & Rem. Code ................................................................................................ 41, 42

**Rules**

Fed. R. Civ. P. 12 ............................................................................................................................... 14

Fed. R. Civ. P. 15 ......................................................................................................................... 43, 45

**Other Authorities**

Texas House of Representatives Investigative Committee on the Robb Elementary Shooting,
    (July 17, 2022) ................................................................................................................................ 6, 13

USDOJ, Critical Incident Review: Active Shooter at Robb Elementary (2024) ................. 6, 13, 14

**INTRODUCTION**

This case arises from the horrific mass shooting at Robb Elementary School in Uvalde, Texas on May 24, 2022. That tragic event remains the single greatest failure of law enforcement to confront an active shooter in American history. Law enforcement officers – who numbered approximately 376 – confined 31 fourth graders and three teachers with the Shooter[1] for one hour, fourteen minutes and eight seconds, while wounded victims bled onto the classroom floor and the Shooter tortured, taunted, and continued to shoot at them. Plaintiffs are the families of children and teachers who were killed on that day, and a teacher who survived the shooting.

Time is life in an active shooter incident. In the wake of the Columbine school shooting, United States law enforcement agencies, including the Texas Department of Public Safety ("TXDPS"), required its officers, including each of the Defendant officers, to follow specific active shooter protocols that include immediately neutralizing the threat. Those mandates are critical when a shooter's target is a school full of young children. And those mandates are even more critical when – as in Texas and most of the United States – schoolchildren in an active shooter situation are directed to lock down and wait for law enforcement to release them. On a day that will shame America's law enforcement community forever, the 376 officers who arrived at Robb Elementary School knowingly defied their own active-shooter protocols and caused immeasurable suffering.

For nearly an hour and a quarter, Defendant officers shielded themselves instead of defenseless students and teachers, who had been instructed by Texas lockdown policies to remain in their classrooms and rely on law enforcement officers to rescue them. Most Texas elementary school classrooms display the same poster that was near the door of Classroom 111 at Robb

---

[1] Plaintiffs adhere to their pleading practice of not identifying the Shooter by name.

Elementary School: "LOCKDOWN! LOCKS, LIGHTS, OUT OF SIGHT." But lockdowns offer virtually no protection against active shooters wielding AR-15s. Their primary purpose is to buy time for law enforcement officers to arrive and stop the bloodshed. Until then, defenseless students are directed to remain silent and still, easy targets for any shooter who spots them. The children's enforced vulnerability is precisely why law enforcement must act immediately to neutralize an active shooter.

In an unprecedented act of cruelty that directly violated these universally accepted policies and procedures, Defendant officers affirmatively chose to "contain" the Shooter (armed with an AR-15) in the same barricaded classrooms as helpless children and their teachers. Defendants then affirmatively acted to thwart rescue efforts by frantic parents and members of the community, to the point of pointing guns, using a Taser, and handcuffing and physically restraining parents who tried to approach the school. The schoolchildren and teachers did exactly what they were trained to do under Texas lockdown policies: they remained still and silent in their classrooms and waited for law enforcement to release them. Their physical safety was completely in the hands of responding officers. And Defendants exercised the power they had over these children's lives to confine them with the Shooter, rather than to rescue them.

Defendants Garcia, Smith, Simpson, and Fernandez have moved to dismiss on grounds of qualified immunity, failure to state a claim, and standing. Plaintiffs Oscar Orona, et al., respectfully submit this opposition to Defendants' Motion to Dismiss (Doc. 45).

The Motion to Dismiss should be denied because it is legally flawed, mischaracterizes Plaintiffs' pleading, and raises factual issues that are procedurally improper at this stage of the case. According to the Motion, Plaintiffs allege merely that Defendants failed to protect the children from known and serious risks of harm and that Defendants did not commit an affirmative act to

2

create danger. Not so. Plaintiffs allege that Defendants engaged in a series of affirmative acts that created additional harm: they chose to retreat, rather than advance; they trapped defenseless children and teachers with the Shooter for a prolonged period of time; they talked amongst themselves, searched for keys, tried to negotiate with the Shooter, and called for additional assistance and equipment, rather than acting immediately to neutralize the Shooter; they thwarted rescue efforts by parents and members of the community and blocked medics from reaching the wounded until it was too late. Defendants' affirmative acts consigned students and teachers to nearly certain death. Defendants violated Plaintiffs' rights under multiple constitutional provisions, including the fundamental rights of schoolchildren to life and bodily integrity, which have been clearly established for decades in the Fifth Circuit. The Second Amended Complaint ("2AC") alleges in detail, on a minute-by-minute basis, how each Defendant violated these rights, as well as universally acknowledged principles of active shooter response.

Defendants contend that they are entitled to qualified immunity because the courts have never addressed a case as extreme as this one, where officers deliberately barricaded an active shooter with defenseless students and teachers for nearly an hour and a quarter, while affirmatively denying them assistance from parents, members of the community, and emergency medics. Under Defendants' approach, the more extreme and unprecedented their misconduct, the more likely they would be able to claim qualified immunity – since the more outrageous and unprecedented the misconduct, the lower the probability of an on-point prior judicial decision directly addressing it. Section 1983 would effectively be rendered a nullity with respect to the most serious cases of misconduct. Both the Supreme Court and the Fifth Circuit have rejected this troubling argument. The cruel and outrageous nature of Defendants' actions is a reason to deny qualified immunity, not to grant it.

Accordingly, Defendants are not entitled to qualified immunity. As Defendants admit, qualified immunity does not apply to conduct that is "objectively unreasonable." Doc. 45, at 5. Immunity is not warranted unless "officers of reasonable competence could disagree on the issue," Doc. 29, at 6 (quoting *Hope v. Pelzer*, 536 U.S. 730, 752 (2002)), and it is not warranted when officers' actions are "obvious[ly] cruel[]" and unconstitutional. *Hope*, 536 U.S. at 745. That is precisely the situation here. There is no room for reasonable disagreement. Defendants' actions defiled the basic human dignity of the children they should have protected. It is difficult to imagine a more extraordinary violation of the fundamental constitutional rights to life and bodily integrity. If Plaintiffs are denied the right to bring this action, or if Defendants are afforded qualified immunity for their outrageous misconduct, then this generation of school children is a class without constitutional protection, and Section 1983 is an empty promise.

Defendants are not entitled to qualified immunity for a further reason: they deliberately violated universally accepted active shooter response protocols. Qualified immunity does not protect "the plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Rather, qualified immunity is meant only to give "government officials breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Here, law enforcement officials have already admitted that the response at Robb Elementary School was objectively unreasonable. "The law enforcement response to the attack at Robb Elementary School was an abject failure and antithetical to everything we've learned over the last two decades since the Columbine massacre," TXDPS Director McCraw testified before the Texas Senate Special Committee to Protect all Texans. 2AC ¶ 1.10. U.S. Attorney General Merrick Garland stated, "Had law enforcement agencies followed generally accepted practices in an active shooter situation and

4

gone right after the shooter to stop him, lives would have been saved and people would have survived." *Id.* at ¶ 1.14.

"What happened in Uvalde is not acceptable behavior in the eyes of the law enforcement community of the state of Texas," North Richland Hills Police Chief and Texas Police Chiefs Association President Jimmy Perdue told the Texas Senate. San Marcos Police Chief Stan Standridge confirmed: "Our profession failed [on that] date." *Id.* at ¶ 1.12. Law enforcement officers' actions were "indefensible," and "utterly unacceptable," in the words of Senator Ted Cruz. *Id.* at ¶ 1.11.

Exhaustive reviews by the U.S. Department of Justice ("USDOJ") and the Texas House of Representatives authoritatively confirmed that the officers responding to Robb Elementary School violated their active shooter response training. The Texas House report concluded that law enforcement at Robb Elementary rejected these universally established mandates at the expense of children's lives:

> Since the 1999 Columbine tragedy, the law enforcement community has recognized the critical importance of implementing active shooter training for all officers, regardless of specialty. Also, all officers must now acknowledge that stopping the killing of innocent lives is the highest priority in active shooter response, and all officers must be willing to risk their lives without hesitation. At Robb Elementary, law enforcement responders failed to adhere to their active shooter training, and they failed to prioritize saving the lives of innocent victims over their own safety.

Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, at 7 (July 17, 2022).

A review by the U.S. Department of Justice, the nation's premier law enforcement agency, concurred and underscored the mandatory nature of an immediate response regardless of available equipment:

> Since the tragic shooting at Columbine High School in 1999, a fundamental precept in active shooter response and the generally accepted practice is that the first priority

5

must be to immediately neutralize the subject; everything else, including officer safety, is subordinate to that objective. Accordingly, when a subject has already shot numerous victims and is in a room with additional victims, efforts first must be dedicated to making entry into the room, stopping the subject, and rendering aid to victims. These efforts must be undertaken regardless of the equipment and personnel available to those first on the scene. *This did not occur during the Robb Elementary shooting response, where there was a 77-minute gap between when officers first arrived on the scene and when they finally confronted and killed the subject.*

USDOJ, Critical Incident Review: Active Shooter at Robb Elementary, at xvi-xvii (2024) (emphasis added).

These authoritative reviews refute any suggestion that Defendants are entitled to qualified immunity. Defendants have faced disciplinary actions as a result of their misconduct, although it seems clear that higher-ranking TXDPS officers have been shielded from discipline, just as they have been shielded from public scrutiny by the withholding of information.

The Motions to Dismiss should be denied.

## BACKGROUND

Universally accepted protocols require law enforcement officers to immediately isolate and neutralize an active shooter. 2AC ¶¶ 5.34–5.48. TXDPS Director McCraw acknowledged the standard: "the doctrine since [Columbine] has been that in an active shooter situation, it's to immediately locate the subject, isolate him and neutralize him." *Id*. at ¶ 5.38. Director McCraw underlined that point, testifying that "[i]f you don't immediately confront an active shooter, lives are going to be lost." *Id*. Advanced Law Enforcement Rapid Response Training (ALERRT) is nationally recognized as the preeminent active shooter/attack response training provider in the nation. *Id*. at ¶ 5.40. ALERRT teaches that first responders' priorities in an active shooter incident are to first "Stop the Killing," then "Stop the Dying," and then "Evacuate the Injured." *Id*. at ¶ 5.42. Each and every law enforcement department in the state of Texas, including all departments present

at Robb Elementary School on May 24, 2022, was trained on, and was bound to follow ALERRT protocols and training. *Id*. at ¶ 5.41.

According to ALERRT doctrine, the time of confinement in lockdown with the active shooter should be as close to zero as possible. *Id.* at ¶ 5.53. Confining an active shooter with locked down children and teachers creates a death trap. *Id.* at ¶¶ 5.49-5.57. Lockdown deprives teachers and students of assistance from anyone but law enforcement. *Id.* at ¶ 5.51. Parents and family members cannot contact them, find them, or reach them. *Id.* Emergency medical responders cannot get through the law enforcement perimeter to treat the wounded. *Id.* Once law enforcement officers arrive and set up a perimeter, they have undertaken to be the lone vector of rescue for teachers and students. *Id.* Law enforcement officers know this. That is why ALERRT training mandates an immediate neutralization of the shooter. *Id.* at ¶ 5.53.

Defendants violated these fundamental protocols on May 24, 2022, at Robb Elementary School. At 11:29 a.m., the Shooter emerged from his truck, began firing, and then proceeded to the school, where he continued firing. *Id.* at ¶ 5.70-5.74. Once a shot is fired at a school, the situation becomes an active shooter incident. *Id.* at ¶ 5.75. As TXDPS Director McCraw has testified, "[w]hen a subject fires a weapon at a school he remains an active shooter until he is neutralized…." *Id.*

The Shooter walked along the outside of the West building, firing multiple barrages through the windows and exterior walls of classrooms as he passed by them. *Id.* at ¶¶ 5.79-5.83. At 11:33 a.m., he entered the West building via its northwest door, which was closed but unlocked. *Id.* at ¶ 5.85. He walked into the northwest hallway, turned right, and began shooting into Classrooms 111 and 112 through the walls. *Id.* at ¶ 5.86. In Classroom 111, Teacher Arnulfo Reyes put the students in lockdown pursuant to state-mandated protocols, which directed them to stay still and silent until

law enforcement officers came to their rescue, and in Classroom 112 Teachers Eva Mireles and Irma Garcia did the same. *Id.* at ¶¶ 5.18-5.33, 5.88-5.89. The students hid under tables, behind their teachers' desks, and behind backpacks. *Id.* at ¶¶ 5.88-5.89.

The Shooter entered Classrooms 111 and 112 (the two classrooms were connected via an interior door) and shot numerous students in both classrooms. *Id.* at ¶¶ 5.90-5.97. Teachers Irma Garcia and Eva Mireles were shot as they attempted to protect their students with their bodies. *Id.* at ¶ 5.96. Teacher Arnulfo Reyes was shot as the Shooter entered his classroom. *Id.* at ¶ 5.92. As he lay grievously wounded on the floor, he thought, "Somebody's going to come help us." *Id.* at ¶ 5.93. That hope was dashed.

Defendants Arredondo and Gonzales entered the West building at 11:35 a.m., *id.* at ¶ 5.99, and approached Classrooms 111 and 112. *Id.* at ¶¶ 5.113-5.114. They saw the bullet holes in the walls, and one officer said, "it's an AR. It's an AR." *Id.* at ¶ 5.115. As they approached the classroom doors, the Shooter continued firing. *Id.* at ¶ 5.116. An officer suffered a graze on his ear from shrapnel, and another officer received a minor graze wound. *Id.*

All officers on the scene, including Defendants, knew that the Shooter had fired a weapon at a school, and he was an active shooter until neutralized. *Id.* at ¶ 5.117. They knew that officers on scene must immediately isolate and neutralize the Shooter. *Id.*

But Defendants Arredondo and Gonzales, along with other officers, rejected ALERRT doctrine (which required that they neutralize the Shooter immediately) and retreated. *Id.* at ¶ 5.118. They abandoned wounded children and teachers in Classrooms 111 and 112, who remained locked down and still waiting for officers to neutralize the Shooter. *Id.*

Instead, the officers on scene, including Defendants Arredondo and Gonzales, intentionally "contain[ed]" the Shooter so he could not leave Classrooms 111 and 112. *Id.* at ¶ 5.119. They

8

trapped the locked down students and teachers in Classrooms 111 and 112 with the active Shooter. *Id.* at ¶ 5.120. But at no point during a school shooting may law enforcement elect to treat a shooter as a "barricaded subject" and not an active shooter. *Id.* at ¶ 5.46. As TXDPS Director McCraw testified, "[W]hen a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a 'barricaded subject.'" *Id.*

It was clear to all officers on the scene, including Defendants, that there was an active shooter targeting children and teachers in Classrooms 111 and 112 and that some of the victims trapped in the Classrooms must already have been hit. *Id.* at ¶ 5.128. Still, officers prioritized their own safety over the safety of the terrified, locked down, and defenseless students and teachers they were obliged to protect. *Id.*

After the initial shots, the Shooter fired multiple fusillades of deadly bullets that all officers on scene would have heard: 11 shots over 53 seconds at 11:36 a.m.; three shots at 11:37 a.m.; one shot at 11:44 a.m.; and four shots at 12:21 p.m. *Id.* at ¶ 5.256. Defendants' refusal to immediately neutralize the Shooter gave him leisure to torture and traumatize his victims. Children watched as the Shooter told their classmates, "It's time to die," and shoot them. *Id.* at ¶ 5.256. Using the victims' blood as ink, the Shooter wrote "LOL" on the whiteboard in Classroom 111. *Id.* The Shooter mocked wounded children and kicked them to see if they were dead. *Id.*

At 11:37 a.m., Classroom 112 Teacher Eva Mireles called her husband, Officer Ruiz, and told him she had been shot. *Id.* at ¶ 5.138. All officers in the northside hallway heard and understood. *Id.* at ¶ 5.139. A Uvalde Police Department ("UPD") sergeant said, "[w]e have got to get in there." *Id.* at ¶ 5.140. Officer Ruiz tried to save his wife and her students. *Id.* at ¶ 5.183. He told officers in and around the West building that his wife was a teacher in Classroom 112 and had been shot. *Id.* Instead of mounting an effort to neutralize the Shooter, officers stopped Officer Ruiz

from entering Classrooms 111 and 112, took his weapon and escorted him out the door. *Id*. Teacher Mireles later died.

911 dispatch confirmed that class was in session and reported that they had received calls from victims. For example, a child in Classroom 111 called 911 at 11:36 a.m. and whispered, "help me." *Id.* at ¶5.112. At 12:03 p.m., a child in Classroom 112 called 911 and pleaded for help. *Id.* at ¶ 5.193. The call lasted one minute. *Id.* At 12:10 p.m., a student, M.I.C. and a friend quietly took a teacher's phone and called 911, even though they had watched one of their classmates be shot as she tried to call 911. *Id.* at ¶ 5.207. They whispered to the 911 dispatcher that their teacher was still alive and needed help. *Id*. at ¶ 5.215. Dispatch alerted officers in the West building. The UPD Acting Chief said, "[a] child just called. They have victims in there. Called 911." *Id*. at ¶ 5.216.

Emergency medical responders arrived in front of the school as early as 11:41 a.m., *id.* at ¶ 5.151, but were blocked by officers from reaching the victims. A Border Patrol medic said to officers in and near the West building, "the victims have been bleeding for a while." *Id*. at ¶ 5.235. Officers still did not permit the medic to approach Classrooms 111 and 112. *Id*.

Families and parents began gathering near the school starting at 11:41 a.m. but were blocked by officers from reaching their children and the other victims. *Id.* at ¶ 5.156. Family members were handcuffed, tasered, and physically restrained by officers, including TXDPS officers. *Id*. at ¶¶ 5.164-5.169. One man surrounded by law enforcement officers was knocked down, and two TXDPS officers stood over him and prevented him from getting up. *Id*. at ¶ 5.167. Another officer aimed a rifle at Miguel Cerrillo, father of one of the trapped students, and told him and other parents to get away. Cazares First Amended Complaint, Case No. 2:24-cv-00049, Document 34 at ¶ 266. Some parents were armed, and might have been able to rescue their children, but officers stopped them. 2AC at ¶ 5.199.

Officers prolonged the lockdown and slaughter in favor of searching for keys, which they did not need because the door to Classroom 111 was unlocked. *Id*. at ¶ 5.214. They also attempted to negotiate with the Shooter, in clear violation of the ALERRT doctrine. *Id*. at ¶¶ 5.180, 5.189, 5.230, 5.232.

The Shooter's lethal AR-15 paralyzed Defendants' response, *id.* at ¶ 5.175, even though one of the first officers to arrive at the scene by 11:32 a.m. was armed with an AR-15 and extra magazines. *Id.* at ¶ 5.84. Radio broadcasts reported that the Shooter was using an AR-15, and at least one officer responded to the news with an expletive. *Id.* at ¶ 5.174. A UPD officer commented later, "I knew too it wasn't a pistol. ... I was like, 'Shit, it's a rifle.'" *Id.* at ¶ 5.175. He added, "The way he was shooting, he was probably going to take all of us out." *Id.* Officers reasoned there was "no way" to take action, and the only thing they could do was wait. *Id*. Officers did not want to move forward until they had rifle-rated shields. *Id.* at ¶ 5.176. One UPD Sergeant said, "You knew that it was definitely an AR .... There was no way of going in.… We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him." *Id.* at ¶ 5.175. But active shooter response doctrine utterly rejects this excuse for delay. Active shooter response doctrines make no exceptions for AR-15s; indeed, the need to immediately neutralize the shooter is even more urgent when an active shooter is using an AR-15. *Id.*

At 12:49 p.m., a team led by a Border Patrol Tactical Team Commander opened the door to Classroom 111, and the Shooter was neutralized shortly afterwards, 77 minutes after the first officers arrived on the scene and after 45 rounds were fired by the Shooter in the presence of officers. *Id.* at ¶ 5.248. No one on the breaching team was seriously injured. *Id.*

The Texas House report concluded that officers violated active-shooter mandates: "[d]espite the immediate presence of local law enforcement leaders, there was an unacceptably

11

long period of time before officers breached the classroom, neutralized the attacker, and began

rescue efforts." Texas House of Representatives Investigative Committee on the Robb Elementary

Shooting, at 7. Officers should have "immediately breach[ed] the classroom by any possible means,

. . . subdue[d] the attacker, and . . . deliver[ed] immediate aid to surviving victims." *Id*. at 8.

A report by the USDOJ similarly concluded that law enforcement violated basic principles

of active shooter response at Robb Elementary School. The report explained that, "[f]ollowing

Columbine, law enforcement expert tacticians and associations testified that the new paradigm for

responding to crises like Columbine is rapid deployment. . . . First responders are instructed to go

toward the violent offender, if necessary, bypassing injured victims and placing themselves in

harm's way." Critical Incident Review: Active Shooter at Robb Elementary, at xviii. The officers

at Robb Elementary School violated this basic principle:

> Despite their training and despite multiple events indicating the subject continued
> to pose an active threat to students and staff in the building, including the likelihood
> and then confirmation of victims inside the room, officers on scene did not attempt
> to enter the room and stop the shooter for over an hour after they entered the
> building. The shooter was not killed until approximately 77 minutes after law
> enforcement first arrived.

*Id.* at xvii-xix. The USDOJ found that, during this lengthy delay, there was ample information

available to law enforcement to indicate that victims remained alive in Classrooms 111 and 112

and that "there was an active threat in classrooms 111/112." *Id.* at xix. The report documented the

pleas of the trapped children:

> "Help!" "Help!" "Help!" "I don't want to die. My teacher is dead." "One of my
> teachers is still alive but shot." "Officer!" "Officer!" "Are they [officers] in the
> building?" "There is a lot of dead bodies." These were the words of nine- and ten-
> year-old children at Robb Elementary School in Uvalde, Texas, on May 24, 2022,
> during a call with 911. At this point in time, these students and three teachers had
> been trapped in classrooms 111 and 112 with an active shooter for 37 minutes. This
> call lasted for nearly 27 minutes. Even though law enforcement were in the hallway,
> just outside the classrooms, it was another 13 minutes after the call ended before
> law enforcement rescued the survivors. In fact, for 77 agonizing, harrowing

minutes, children and staff were trapped with an active shooter. They experienced unimaginable horror.

*Id*. at 1.

## ARGUMENT

## I.    LEGAL STANDARD

To defeat a Rule 12 motion, the complaint need only include sufficient factual allegations "to raise a right to relief above the speculative level" and to provide "fair notice" of the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). In considering a Rule 12(b)(6) motion, the Court must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them . . . and must review those facts in a light most favorable to the plaintiff." *Schydlower v. Pan Am. Life Ins. Co*., 231 F.R.D. 493, 498 (W.D. Tex. 2005) (citation omitted).

"To survive a motion to dismiss in cases where the qualified immunity defense is raised, a plaintiff must state facts, which if proven, would defeat the defense." *Babb v. Dorman*, 33 F.3d 472, 475 n.5 (5th Cir. 1994). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials

13

accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The Supreme Court has opined that "qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law.'" *Id.* (citation omitted).

The Supreme Court has established "a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232 (citation omitted). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* In the interest of judicial economy, "[t]he judges of the district courts [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

The facts relating to qualified immunity must be construed in favor of the non-movant. *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc). If a qualified immunity "claim turns on which of two conflicting stories best captures what happened on the street, the caselaw will not permit summary judgment" – much less dismissal – "in favor of the defendant official ... [A] trial must be had." *Id.* at 455-56 (internal quotation marks and citation omitted). To the extent the Court finds that Plaintiffs lack factually specific allegations as to particular Defendants, Plaintiffs have alleged sufficient facts that warrant additional discovery that could further illuminate the role particular Defendants played in this incident. Defendants cannot both deliberately hide information from Plaintiffs and cry that there is factually insufficient evidence.

Plaintiffs have met their burden under the applicable legal standard.

14

II.     **PLAINTIFFS HAVE ASSERTED CONSTITUTIONAL CLAIMS ENFORCEABLE UNDER SECTION 1983.**

    A.     **Plaintiffs Have Stated Due Process Claims Because Defendants Created a "Special Relationship" Affirmatively Restraining Plaintiffs' Personal Liberty.**

The right to life and safety through personal security is a fundamental interest protected by the substantive component of the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982).  However, in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189 (1989), the Supreme Court held that, as a general matter, a state's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.  But the Court clarified that this general rule is subject to a key exception: "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198.  In particular, "[w]hen the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty,' the state creates a '*special relationship*' between the individual and the state which imposes upon the state a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (quoting *DeShaney*, 489 U.S. at 200) (emphasis added).

The special relationship exception recognized in *DeShaney* is not limited to instances of incarceration or institutionalization. *See DeShaney*, 489 U.S. at 200 (stating a special relationship exists "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself"). The Fifth Circuit has opined that "the duty owed by a state to prisoners and the institutionalized might also be owed to other categories of persons in custody by means of similar restraints of personal liberty." *Walton v. Alexander*, 20 F.3d 1350, 1354 (5th Cir. 1994), on reh'g en banc, 44 F.3d 1297 (5th Cir. 1995) (citations and internal

15

quotation marks omitted). In particular, the Fifth Circuit has noted that a special relationship exists where the state has placed "limitation[s] on the individual's ability to act on his own behalf," *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990), or has effectively "deprive[d] the plaintiff of the ability or opportunity to provide for his own care and safety." *Walton*, 44 F.3d. at 1305.

That is exactly the situation here. Defendants undertook a series of affirmative actions that effectively restrained Plaintiffs by barricading them with the Shooter in Classrooms 111 and 112 and prevented them from taking individual initiatives to free themselves.

- The State trained both students and teachers in lockdown procedures that directed them to remain in their classrooms. Defendants knew that the students and teachers in all classrooms at Robb Elementary School – including Classrooms 111 and 112 – would follow lockdown procedures and remain in their classrooms until authorized by law enforcement officers to leave. 2AC ¶ 7.5.

- Defendants made the deliberate decision to barricade the active Shooter with children and teachers in Classrooms 111 and 112, where they knew the victims had been trained to remain in place as part of the lockdown training. Defendants affirmatively trapped the victims in the same classrooms as the Shooter. *Id.* at ¶ 7.6.

- Each Defendant knew that the Plaintiffs were unable to provide for their own safety when confined to a classroom with an active shooter armed with an AR-15. *Id.* at ¶ 7.7.

- Defendants were fully aware of the danger their actions created for Plaintiffs, and yet Defendants violated the ALERRT doctrine and every principle of their active shooter response training by failing to neutralize the Shooter. *Id.* at ¶¶ 7.14, 7.18-7.20. Each Defendant acted with deliberate indifference to the plight of the victims. *Id.* at ¶ 7.17.

- When students attempted to call 911, they were instructed to keep quiet and remain in their classrooms. The children were promised that Defendants would rescue them. *Id.* at ¶ 7.13.

- Defendants affirmatively prevented Plaintiffs from receiving outside assistance from family members, who themselves were physically restrained at the school's perimeter. Each Defendant knew and intended that this law enforcement perimeter would reach parents from reaching their children inside Robb Elementary School to provide safety from the Shooter. *Id.* at ¶¶ 7.9-7.10. Defendants affirmatively prevented parents and members of the community from taking action to save the victims. *Id.*

- Had parents been able to reach Robb Elementary School, they or law enforcement officers would have breached the classrooms and neutralized the Shooter well before 12:49 p.m., and emergency personnel would have been able to enter the classrooms and provide emergency medical services to wounded children. *Id.* at ¶ 7.24.

- Defendants similarly prevented emergency medics from providing assistance to the wounded at Robb Elementary School. Each Defendant knew their actions were delaying medics from reaching Classrooms 111 and 112 and knew they were exposing the wounded in those classrooms to serious injury or death. *Id.* at ¶¶ 7.11-7.12.

In short, Defendants' affirmative actions deprived Plaintiffs of any "realistic means of voluntarily terminating" the barricade outside classrooms 111 and 112 and wholly deprived Plaintiffs "of the ability or opportunity to provide for [their] own care and safety." *Walton*, 44 F.3d. at 1305.

Although the Fifth Circuit has held that in the ordinary case compulsory school attendance laws do not "alone" create a special relationship within the meaning of *DeShaney*, *see Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997), prior Fifth Circuit decisions did

17

not involve the extreme exercise of custodial power Defendants engaged in here. In *Hillsboro*, for example, the Fifth Circuit observed that ordinarily the school's custody is "intermittent" because "the student returns home each day. Parents remain the primary source for the basic needs of their children." *Id*. Here, those exercising custody and control of the children were armed law enforcement officials, not school officials. And their exercise of control was absolute. Defendants did not permit the trapped children to "return home," despite pleas for release. And they expressly denied parents the right to serve as "the primary source" for safety, bodily integrity, and the other "basic needs of their children." Indeed, Defendants took affirmative steps to ensure the opposite was true. Defendants effectively barricaded the victims in Classrooms 111 and 112 and affirmatively prevented parents from attempting to remove or rescue their children – to the point of using a Taser and other physical force against parents.

Defendants also rely on *Doe ex rel. Magee v. Covington Cnty. School Dist. ex rel. Keys*, 675 F.3d 849 (5th Cir. 2012), but there the Fifth Circuit noted that one reason compulsory school attendance laws do not by themselves create a special relationship is that "parents were free at any time to remove [their children] from the school if they felt that [their] safety was being compromised." *Id.* at 861. Defendants affirmatively denied the parents of the children in this case such an opportunity.[2]

Defendants effectively removed children from the custody and protection of their parents and assumed the responsibility for their protection. The Fifth Circuit has held that a "special relationship" exists in such a situation. *Griffith*, 899 F.2d at 1439 ("TDHS created a 'special

---

[2] Defendants err in pointing to dissimilar mass shootings. Doc. 33, at 8 (citing *Vielma v. Gruler*, 347 F. Supp. 3d 1122, 1128 (M.D. Fla. 2018), aff'd, 808 F. App'x 872 (11th Cir. 2020) (Pulse nightclub shooting where officer working as security guard "abandoned his post" prior to shooting); *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1330 (11th Cir. 2020) (expressly noting that students did not allege that officials "restrain[ed]" them)).

relationship' with the Griffiths' children when it removed them from their natural homes and placed them under state supervision. At that time, TDHS assumed the responsibility to provide constitutionally adequate care for these children.").

### B. Plaintiffs Have Also Stated Substantive Due Process Claims Under the State-Created Danger Doctrine.

The state-created danger doctrine is an independent basis for Plaintiffs' substantive due process claims. The doctrine stems from the Supreme Court's recognition in *DeShaney* that Section 1983 liability for private-actor conduct may arise if the state played a part in creating the danger the victim faced. *See* 489 U.S. at 201 ("While the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.") Numerous courts have interpreted this statement as providing an exception to *DeShaney* where the state acts to create or increase the danger of private harm. Indeed, ten courts of appeals have adopted the so-called "state-created danger doctrine."[3]

As this Court has recognized, "the Fifth Circuit has never explicitly adopted" the state-created danger doctrine. *Luevano v. Geyer*, 2009 WL 10700090, at *4 (W.D. Tex. Feb. 23, 2009) (Moses, C.J.). "Nonetheless, the Fifth Circuit has held that in order to establish a cause of action

---

[3] *See Irish v. Fowler*, 979 F.3d 65, 67, 74-75, 77 (1st Cir. 2020) (the state-created danger "theory of substantive due process liability is viable" and clearly established); *Okin v. Vill. of Cornwall-On-Hudson P.D.*, 577 F.3d 415, 434 (2d Cir. 2009) (state-created danger theory a clearly established right); *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996) ("[T]he state-created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983."); *Doe v. Rosa*, 795 F.3d 429, 438–39 (4th Cir. 2015) (recognizing state-created danger theory); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066–67 (6th Cir. 1998) (plaintiffs stated viable claims under state-created danger theory); *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (recognizing state-created danger theory); *Glasgow v. Nebraska*, 819 F.3d 436, 442 (8th Cir. 2016) (same); *Wood v. Ostrander*, 879 F.2d 583, 589–96 (9th Cir. 1989) (concluding plaintiff stated a valid claim under state-created danger theory); *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018) (recognizing state-created danger theory); *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001) ("[T]he State also owes a duty of protection when its agents create or increase the danger to an individual.").

under the state-created danger exception, the plaintiff in theory would have to show that the harm

to the plaintiff resulted because '(1) the state actors created or increased the danger to the plaintiff

and (2) the state actors acted with deliberate indifference.'" *Id.* (quoting *Morin v. Moore*, 309 F.3d

316, 321-22 (5th Cir. 2002)).

Those factors are easily met on the basis of the already known facts of this case. Defendants

created or increased the danger faced by the Plaintiffs by barricading the locked-down students and

teachers with the Shooter and by preventing parents, members of the community and emergency

medics from assisting the victims. Defendants knew the dangers their actions created for the

Plaintiffs – indeed, the ALERRT doctrine is premised on the need to respond to those dangers as

quickly as possible – but were deliberately indifferent. The evidence indicates that Defendants were

more concerned with their own personal safety, because they feared the Shooter's AR-15.

Defendants affirmatively barricaded the Shooter in the victims' classrooms for 77 minutes

without attempting to breach the doors and neutralize him. Plaintiffs have alleged that "the state

actors created a dangerous environment, that they knew it was dangerous, and that they used their

authority to create an opportunity that would not otherwise have existed for the third party's crime

to occur." *Luevano*, 2009 WL 10700090, at *5 (quoting *McKinney v. Irving Indep. Sch. Dist.*, 309

F.3d 308, 313-14 (5th Cir. 2002) (internal quotations and alterations omitted)). By pleading that

Defendants prevented assistance from parents, members of the community, and emergency medics,

Plaintiffs have alleged Defendants' "culpable knowledge and conduct in affirmatively placing an

individual in a position of danger, effectively stripping a person of her ability to defend herself, or

cutting off potential sources of private aid." *Id.*

20

Recognizing the state-created danger doctrine in this extraordinary case would be fully consistent with Fifth Circuit caselaw. In *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198 (5th Cir. 1994), for example, the Fifth Circuit outlined the elements and contours of the doctrine:

> When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state "custody." This principle has been applied in a number of cases from other circuits.
>
> . . .
>
> The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus, the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur. Put otherwise, the defendants must have been at least deliberately indifferent to the plight of the plaintiff.

*Id.* at 200–01 (citations and internal quotation marks omitted). In *Johnson*, the Fifth Circuit acknowledged the state-created danger doctrine, concluding only that the pleadings in that case were insufficient to state a claim, even accepting the doctrine's validity. *Id.* at 201.[4]

---

[4] The Fifth Circuit again recognized the doctrine in *Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003), opining that "the district court should have concluded that the plaintiffs stated a section 1983 claim under the state-created danger theory." *Id.* at 538. In a subsequent case, the Fifth Circuit went on to note that *Scanlan* "clearly implied recognition of state created danger as a valid legal theory," but later withdrew that portion of the opinion on rehearing. *Breen v. Texas A&M Univ.*, 485 F.3d 325, 336 (5th Cir. 2007); *Breen v. Texas A&M Univ.*, 494 F.3d 516, 518 (5th Cir. 2007). The Fifth Circuit has since clarified that *Scanlan* did not officially adopt the theory. *See, e.g.*, *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 422–23 (5th Cir. 2006). But in subsequent cases, the Fifth Circuit has held merely that the specific pleadings before it did not adequately satisfy the theory. *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010) ("This circuit has not adopted the state-created danger theory. Regardless, the state-created danger theory would not apply here."); *Covington Cnty. Sch. Dist.*, 675 F.3d at 865–66 ("Although we have not recognized the [state-created danger] theory, we have stated the elements that such a cause of action would require. . . . [E]ven if we were to embrace the state-created danger theory, the claim would necessarily fail [due to insufficient allegations]."); *Dixon v. Alcorn Cnty. Sch. Dist.*, 499 F. App'x 364, 368 (5th Cir. 2012) ("There is therefore no need to determine whether this Court should adopt the state-created danger theory of liability on the present facts."); *Est. of Lance v. Lewisville Indep.*

Prior Fifth Circuit cases declining to apply the state-created danger doctrine have not involved the kind of extraordinary facts created by Defendants here. In *McClendon*, 305 F.3d 314, for example, the Court of Appeals found no constitutional violation where a police officer provided a gun to a confidential informant, where there was no evidence that the officer was aware of any violent intentions on the part of the informant or that the officer could have anticipated that the informant would have a chance encounter with the plaintiff and would use the gun to assault the plaintiff. Similarly, in *Morin*, 309 F.3d 316, the Fifth Circuit found no constitutional violation where a police officer left a gun accessible to his son, who then took the gun and shot his ex-girlfriend and her new boyfriend. *See also Luevano*, 2009 WL 10700090, at *5 ("In following suit with Fifth Circuit cases, the Court finds that even assuming the existence of recovery for harm done by a private party under a state-created danger exception, the Plaintiff in the present case has failed to establish the requisite elements."). But here, Plaintiffs' Second Amended Complaint amply alleges the elements of culpable knowledge and conduct that satisfy the state-created danger doctrine. This case involves much more than the compulsory school situation, but rather a series of affirmative acts by Defendants that created or increased the danger faced by Plaintiffs and affirmatively denied them aid from parents, members of the community, and emergency medics.

Defendants' arguments to the contrary lack merit. For example, Defendants contend that they were not aware of a specific danger "to a *known* victim." Doc. 29, at 10 (emphasis added). Defendants may not have known the names of the particular victims (although Officer Ruiz made them aware that one of them was his wife), but Defendants certainly knew of the specific group at extreme peril: the children and teachers in Classrooms 111 and 112. Defendants also knew specific

---

*Sch. Dist.*, 743 F.3d 982, 1003 (5th Cir. 2014) ("[T]his case does not sustain a state-created danger claim, even assuming that theory's validity").

child victims were still alive because they received 911 calls from children confined in Classrooms 111 and 112 during the shooting.

Because the Fifth Circuit has not expressly rejected the state-created danger doctrine, but rather has laid out its elements and contours, at a minimum Plaintiffs should be allowed to develop evidence as to a state-created danger claim in discovery. *See Kemp v. City of Houston*, 2013 WL 4459049, at *6 (S.D. Tex. Aug. 16, 2013) (denying summary judgment motion and allowing state-created danger claim to proceed to trial because "[w]hether the evidence at trial rises to a level sufficient to submit this claim to the jury, particularly since the Fifth Circuit has not yet adopted the theory, remains to be seen").

### C. Plaintiffs Have Stated a Fourth Amendment "Seizure" Claim.

Although this Court need not go further to decide this case, Plaintiffs have also stated a claim of unreasonable "seizure" under the Fourth Amendment. A person is seized when an officer, "by means of physical force or *show of authority*, has in some way restrained" that person's liberty. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) (emphasis added). Physical force is not required for a seizure to occur—a "show of authority" to which a person submits is sufficient. *Torres v. Madrid*, 592 U.S. 307, 311 (2021) (citation omitted); *see also McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) ("submission to the assertion of authority" constitutes seizure) (citation omitted). When considering whether a seizure occurred, courts must assess, "in view of all of the circumstances surrounding the incident, [whether] a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

Students were "seized" for purposes of the Fourth Amendment because they were confined to their classrooms, both by state-mandated lockdown procedures and by the decision of Defendants to barricade the Shooter in their classrooms. These actions resulted in both physical restraints on the students' liberty and also a show of authority that restrained their liberty.

A sign posted by the door in Classroom 111 instructed students: "LOCKDOWN! LOCKS, LIGHTS, OUT OF SIGHT." 2AC ¶ 1.2. Training drills on these procedures are mandatory under state law. *Id*. at ¶¶ 5.13, 5.18-5.22. The teachers and students at Robb Elementary School conducted training drills on the Texas rules and had experienced multiple lockdowns in addition to the two drills per year required by Texas law. *Id*. at ¶¶ 5.30-5.33. Pursuant to Texas lockdown protocols, students are required to remain in the classroom and keep the classroom door closed until law enforcement officers open it. *Id*. at ¶ 5.26. The children are mandated to wait for law enforcement, even in active shooter situations, and not to use their phones. *Id*. at ¶¶ 5.27-5.29. On May 24, 2024, the students in Classrooms 111 and 112 did exactly what they were supposed to under Texas lockdown rules – they hid silently in their classrooms. *Id*. at ¶¶ 5.88-5.89, 5.91.

Lockdown procedures mean that responding law enforcement officers have the sole power to determine when students and teachers will be allowed to leave their classrooms. Defendants knew that the students and teachers in all classrooms at Robb Elementary School – including Classrooms 111 and 112 – would follow lockdown procedures and remain in their classrooms until authorized by law enforcement officers to leave. *Id.* at ¶ 7.5.

In addition to the lockdown procedures, Defendants took control of the physical space of the students and teachers, as well as that of the Shooter. *Id.* at ¶ 7.6. Instead of rescuing Plaintiffs, Defendants affirmatively trapped them in the same classrooms as the Shooter and knew that this would prevent Plaintiffs from voluntarily leaving Classrooms 111 and 112. *Id*.

Parents were also "seized," for purposes of the Fourth Amendment. Officers physically restrained parents, to the point to tasering one parent, knocking another one down and preventing him from standing up, and pointing a rifle at a third. *Id.* at ¶¶ 5.164-5.169, 7.9-7.10.

All of these actions constitute "seizures" for purposes of the Fourth Amendment.

24

Defendants argue that they intended to restrain the Shooter, not the students and teachers. Doc. 32, at 13. This assertion is absurd. The Shooter had found his targets and had no intention of leaving. The awful truth is that Defendants restrained the children and teachers with the Shooter, and they cannot avoid that truth now. Moreover, Defendants' attempt to argue questions of intent fails because it raises fact issues that cannot be resolved on a motion to dismiss. It simply underscores the need for discovery.

Defendants also argue that their actions were "reasonable" under the Fourth Amendment. Doc. 28 at 14; Doc 29 at 8; Doc. 32, at 9. But Plaintiffs have alleged detailed facts showing otherwise, and Defendants' clear violations of the nationally recognized mandate to immediately neutralize the Shooter refute any suggestions of reasonableness. Again, this is a fact question that cannot be resolved on a motion to dismiss.

Defendants argue that the Fourth Amendment does not apply in this case, but nonetheless insist that the mere presence of Fourth Amendment allegations precludes their substantive due process claim. That argument fails. If this Court concludes there was no "seizure" for purposes of the Fourth Amendment, it should proceed to consider Plaintiffs' substantive due process claims. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-55 (1998) (proceeding to consider substantive due process Section 1983 claim after concluding that the Fourth Amendment did not apply to plaintiffs' claims).

## III. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants' primary argument is that they are entitled to qualified immunity because no court has ever confronted a case like this one, where law enforcement officers deliberately barricaded an active shooter wielding an AR-15 with students and teachers for 77 minutes and then proceeded to affirmatively deny parents, members of the community, and emergency medics the ability to offer assistance. The horrific and outrageous nature of Defendants' actions is a reason to

deny qualified immunity, not to grant it. Defendants' conduct was patently unconstitutional in violating Plaintiffs' most basic rights to bodily integrity and life. Defendants flouted every tenet of the ALERRT doctrine and their active shooter training.

### A.  Defendants Violated Clearly Established Law.

The Fifth Circuit has long held that right of every schoolchild to bodily integrity – let alone life – is clearly established. In *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 455-56 (5th Cir. 1994), the Fifth Circuit specifically rejected a qualified immunity defense in holding that the rights of students to bodily integrity was clearly established since at least 1987. A *fortiori*, the right of students to invasions of bodily integrity that end their lives must be treated as clearly established as well.

Further, both the Supreme Court and Fifth Circuit have made clear that officers are not entitled to qualified immunity where the impropriety of their conduct is obvious.  In *Hope*, 536 U.S. 730, for example, the Supreme Court held that state officers are not entitled to qualified immunity where it is "obvious" that their conduct is unconstitutional (there, shackling a prison inmate to a hitching post), even where the plaintiff's claim "was not supported by earlier cases with 'materially similar' facts."  *Id.* at 733, 745. The Court explained that an officer's conduct can be so egregious on its face that it "should have provided [officers] with some notice that their alleged conduct violated" the law. *Id.* at 745-46. The Court added that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. The Court reasoned that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* (internal quotation marks and citation omitted; brackets in original).

Similarly, in *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam), the Supreme Court summarily reversed the Fifth Circuit for granting qualified immunity to state officials who confined an inmate in shockingly unsanitary conditions, despite the absence of direct precedent prohibiting such a practice. The Court explained that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Id*. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). But where a case presents "extreme circumstances" under which "no reasonable [state] officer could have concluded" that the conduct was "constitutionally permissible," then qualified immunity does not apply. *Id.*

In the wake of *Hope* and *Taylor*, the Fifth Circuit has also recognized that qualified immunity "does not immunize those officials who commit novel, but patently 'obvious,' violations of the Constitution." *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) (quoting *Hope*, 536 U.S. at 745). *See also Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc) (denying qualified immunity because "[t]his is an obvious case"); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (affirming denial of motion to dismiss on immunity grounds in an "obvious case").

Thus, to show that a right was "clearly established," a plaintiff need not establish that "the [specific] action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This Court has similarly opined that to defeat a claim of qualified immunity, "it is not a prerequisite for the specific act in question to have been previously deemed unlawful." *Rynearson v. United States*, 2013 WL 11309342, at \*6 (W.D. Tex. Sept. 30, 2013) (Moses, C.J.).

This case is governed by *Hope*, *Taylor*, and their progeny. It is obvious that Defendants actions were both constitutionally impermissible and a clear violation of the most fundamental principle of active-shooter response, which requires immediate neutralization of the Shooter. In

*Hope*, the Supreme Court reasoned that using a hitching post was "antithetical to human dignity" and "both degrading and dangerous." 536 U.S. at 745. It held that the "obvious cruelty" inherent in their actions provided the officers with "some notice" that their actions violated the plaintiff's constitutional rights. *Id.* In *Taylor*, the Court held that confinement in an unsanitary prison cell was unconstitutional. *Tyson* involved sexual abuse, which violated the plaintiff's "right to bodily integrity." 42 F.4th at 520.

The violation in this case was even worse and even more "obviously" unconstitutional. Defendants deliberately trapped innocent children and teachers with a gunman armed with an AR-15 in barricaded classrooms for 77 minutes, while shots continued to ring out and victims continued to plead for assistance. This cruel conduct was "antithetical to human dignity," "both degrading and dangerous," and resulted in a complete abrogation of the "right to bodily integrity" for those confined in Classrooms 111 and 112.

The allegations pleaded in the complaint establish an obvious constitutional violation. To the extent Defendants attempt to deny the obvious nature of the constitutional violation (*e.g.*, Doc. 32, at 6-7, 13; Doc. 28, at 13-14), they rely on factual assertions and assumptions that cannot be credited on a motion to dismiss and show precisely why discovery is necessary in this case. Defendants insist they had "to make decisions quickly, under pressure, and without the luxury of hindsight." Doc. 33, at 9. They raise questions concerning how much they knew about the danger faced by the children in Classrooms 111 and 112. *Id.* They seek to justify their admitted "delay in entering the classrooms." Doc. 28, at 13. All these assertions rather fact issues that warrant discovery, not dismissal at the motion to dismiss stage.

Moreover, Defendants are not entitled to qualified immunity for an additional reason absent in the prior Fifth Circuit cases cited by Defendants: their conduct was a deliberate and knowing

28

violation of the active-shooter response mandate to immediately neutralize a shooter. Plaintiffs' allegations in that regard have been confirmed by numerous law enforcement authorities and independent reviews by the U.S. Department of Justice and a special committee of the Texas House of Representatives. Defendants have been subject to disciplinary actions and even criminal indictments. In *Hope*, the Supreme Court looked to a regulation promulgated by the Alabama correctional department (as well as to a review conducted by the U.S. Department of Justice) in determining that defendant officers were not entitled to qualified immunity because they had "fair warning" that their conduct "violated [established] law" and "were fully aware of the wrongful character of their conduct." 536 U.S. at 744. The Court reached that conclusion even though the Alabama regulation was much less straightforward than the active-shooter mandate, which unambiguously requires officers to neutralize an active shooter as soon as possible. In contrast, the Alabama regulation in *Hope*, far from being an outright ban on the use of a hitching post, actually authorized such use under certain circumstances. *See id.*

Similarly, in *Zadeh v. Robinson*, 928 F.3d 457, 469 (5th Cir. 2019), the Fifth Circuit looked to state regulations to determine whether the defendants' conduct violated clearly established law. Accordingly, Defendants' blatant violation of the ALERRT doctrine and active shooter response protocols deprives them of qualified immunity. Indeed, extending qualified immunity for intentional violations of fundamental training protocols would turn the concept of qualified immunity on its head. Officers are expected to fall back on their training when they confront an active shooter situation like the one presented at Robb Elementary School – not to disregard it. Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. Rather, qualified immunity is meant only to give "government officials breathing room to make reasonable but mistaken judgments about open legal questions."

29

*al-Kidd*, 563 U.S. at 743; *see also Pearson*, 555 U.S. at 231 ("qualified immunity covers 'mere mistakes in judgment'") (citation omitted). This not a case of a "reasonable but mistaken" judgments or "mere mistakes in judgment" by law enforcement officers. Rather, this case involves tragic and inexcusable derelictions of duty. What Defendants seek is effectively *absolute*, not *qualified*, immunity.

Defendants do not deny that the "special relationship" doctrine under *DeShaney* and the Fourth Amendment prohibition on unreasonable seizures both qualify as "clearly established" law. However, Defendants contend that the state-created danger doctrine does not constitute clearly established law. That argument is incorrect. Ten different circuits have adopted the state-created danger theory, with no circuit rejecting it. Courts "may consider the law of other circuits when determining whether a constitutional right is clearly established." *Saenz v. City of McAllen*, 396 F. App'x. 173, 177 (5th Cir. 2010). Thus, a rule can become clearly established on the basis of a decision by a "robust consensus of persuasive authority," as well as by a decision of the Fifth Circuit or Supreme Court. *Morgan v. Swanson*, 659 F.3d 359, 382 (5th Cir. 2011) (en banc). Although the Fifth Circuit has held the state-created danger doctrine was not clearly established for conduct occurring in 1993, *McClendon*, 305 F.3d at 332–33, and in unpublished decisions that the doctrine was not clearly established for conduct occurring in 2005 and 2006, *see Walker v. Livingston*, 381 F. App'x. 477, 479–80 (5th Cir. 2010); *Saenz*, 396 F. App'x. at 177, none of these cases involved the extraordinary facts here. Although the Fifth Circuit has not expressly adopted the state-created danger doctrine, it has provided a roadmap to pleading a claim under that doctrine. There is ample authority in the Fifth Circuit that outlines the elements of the state-created danger doctrine and thereby "defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72. A legal theory need not have been expressly adopted

by the Fifth Circuit to put a defendant on notice that "every reasonable official would understand that what he is doing violates the law," and thus for the doctrine to be clearly established. *Id*.

Defendants' assertion of qualified immunity should be rejected.

### B.     The Doctrine of Qualified Immunity Lacks Legal Basis

Plaintiffs preserve the argument that the doctrine of qualified immunity has no legal basis. As Judge Willett of the Fifth Circuit recently noted, recent academic scholarship "paints the qualified-immunity doctrine as flawed—foundationally—from its inception," because "courts have been construing the wrong version of § 1983 for virtually its entire legal life." *Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) (Willet, J., concurring). The original text of Section 1 of the Civil Rights Act of 1871 (known as § 1983) included a "Notwithstanding Clause" that "explicitly displaces common-law defenses"—including qualified immunity—by stating that "§ 1983 claims are viable notwithstanding 'any such law, statute, ordinance, regulation, custom, or usage of the State to contrary.'" *Id*. at 979-80. But "[f]or reasons lost to history, the critical 'Notwithstanding Clause' was inexplicably omitted from the first compilation of federal law in 1874." *Id.* at 980. Thus, "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Id*. (emphasis in original). The Supreme Court has explained that language of the statute as passed (known as a "Statutes at Large") is controlling, even if codified incorrectly or never codified at all. *See United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc*., 508 U.S. 439, 448 (1993).

Moreover, multiple Supreme Court Justices have expressed serious reservations about qualified immunity and a willingness to revisit its legal basis.  *See Hoggard v. Rhoades*, 141 S. Ct. 2421, 2422 (mem) (2021) (Thomas, J., statement respecting the denial of certiorari); *see also Baxter v. Bracey*, 140 S. Ct. 1862 (mem) (2020) (Thomas, J., dissenting from denial of certiorari);

*Kisela v. Hughes*, 584 U.S. 100, 120-121 (2018) (Sotomayor, J., dissenting); *Ziglar v. Abbasi*, 582 U.S. 120, 159-160 (2017) (Thomas, J., concurring in part and in judgment). Plaintiffs therefore reserve the right to argue that qualified immunity has no legal basis at all in this case.

## IV. PLAINTIFFS HAVE SUFFICIENTLY PARTICULARIZED THE LEGAL LIABILITY OF EACH DEFENDANT.

Defendants contend that the 2AC fails to particularize the liability of each Defendant. To the contrary: the Complaint contains a detailed, minute-by-minute chronology of the horrific events at Robb Elementary School on May 24, 2022. Plaintiffs describe below the actions of each Defendant during that day and how they generate liability for each of them. Under Section 1983, a defendant may be held liable if he was "either personally involved in the deprivation or [if] his wrongful actions were causally connected to the deprivation." *James v. Texas Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). The facts pleaded demonstrate that each Defendant was personally involved in the deprivation and also that their wrongful actions were causally connected to the deprivation.

At the outset, however, Defendants overlook several facts and legal principles that create liability for all Defendants, without the need for the Court to delve into the minute-by-minute conduct of each Defendant.

### A. Defendants Overlook Key Facts and Legal Principles Establishing the Liability of Each Defendant.

The first principle that Defendants overlook is bystander liability in the Section 1983 context, which is firmly established in the Fifth Circuit. An officer may be liable under § 1983 under a theory of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). *See also Hughes v. Garcia*, 100 F.4th 611, 622 (5th Cir. 2024) (upholding denial of motion to dismiss on qualified

32

immunity grounds on the basis of bystander liability against law enforcement officer); *Diaz v. Cantu*, 2024 WL 489443, at \*6 (W.D. Tex. Feb. 5, 2024) (Moses, C.J.) (denying motion to dismiss bystander liability claims in Section 1983 case).

Thus, each Defendant officer may be held liable for simply standing by and witnessing the constitutional violation, because each had reasonable opportunity to prevent the harm. Under the ALERRT doctrine, each and every officer on scene had the duty to act immediately to neutralize the Shooter. ALERRT doctrine requires law enforcement to act immediately. Waiting for equipment, more direction, more highly trained officers, and all other forms of delay violate the primary and fundamental requirement of the ALERRT doctrine. 2AC ¶ 5.44. Waiting for a four- or five-person team of first-on-site officers likewise violates this primary requirement. *Id.* at ¶ 5.45. Solo response by one officer acting alone is required when the situation demands. *Id.* ALERRT doctrine provides that "[t]he best hope that innocent victims have is that officers immediately move into action to isolate, distract or neutralize the threat, even if that means one officer acting alone." *Id.*

Similarly, it is no excuse for Defendants to blame senior officers for the lack of leadership and command. ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that waiting is not an option. *Id.* at ¶ 5.44. TXDPS policy instructs that each one of its officers "must be a problem-solver, a critical thinker, and must work independently." *Id.* at ¶ 5.106. The feasibility of independent action is shown by the fact that ultimately the Shooter was neutralized by a Border Patrol tactical team finally deciding to stop the killing, not by any of the hundreds of officers standing by as the Shooter tortured and slaughtered innocent children for 77 minutes. *Id.* at ¶¶ 5.242, 5.248, 5.254.

Second, Defendants ignore that the UPD radio channel was accessible to all law enforcement in the area, including UCISD-PD and TXDPS Defendants. *Id.* at ¶ 5.76. UPD broadcast numerous reports about the mass shooting at Robb Elementary School, and Plaintiffs have alleged that some or all UCISD-PD and TXDPS officers responding to the scene heard these broadcasts on the UPD channel. *Id.*

Those reports make it impossible for individual Defendants to deny knowledge of the active shooting or the extreme peril that the victims faced. For example, at 11:30 a.m. on May 22, UPD radio broadcast that shots had been fired at Robb Elementary School and asked all units to respond. *Id.* at ¶ 5.74.  At 11:33 a.m., UPD radio broadcast that there was a shooter inside Robb Elementary School, that there was a shooting inside, and this was a "school shooting." *Id.* at ¶ 5.87. At 11:35 a.m., a UPD Sergeant approached the south doorway of the West building and transmitted over the radio, "Shots fired! Get inside! Go, go, go!" *Id.* at ¶ 5.98. At 11:39 a.m., an officer alerted others over the radio, "I have a male subject with an AR." *Id.* at ¶ 5.144.

At 11:41 a.m., the UPD radio broadcast, "Male subject is still shooting." *Id.* at ¶ 5.150. Defendant TXDPS and UCISD-PD Officers at the scene and responding to the scene heard this transmission. *Id.* At 11:41 a.m., UPD radio broadcast that there was a possible gunshot victim in a classroom. *Id.* at ¶ 5.155.  Again, TXDPS Defendant and UCISD-PD Defendant officers at the scene and responding to the scene heard this transmission. *Id.* They knew that they had trapped the Shooter with the victim and cut her off from help, and that they were continuing her entrapment without medical assistance. *Id.*

At 11:42 a.m., UPD radio broadcast that class in Classroom 112 "should be in session right now … the class should be in session right now." *Id.* at ¶ 5.157. TXDPS Defendant and UCISD-PD Defendant officers at the scene and responding to the scene heard this broadcast, which

confirmed what officers already knew: that they had trapped the Shooter with students and teachers in Classrooms 111 and 112, and that every second they failed to act prolonged the risk to those students and teachers locked down with the Shooter. *Id.* At 12:12 p.m., UPD radio broadcast that a child had called 911 and was in a room full of victims. *Id.* at ¶ 5.211. This transmission was heard on both sides of the hall and outside the building. *Id.*

Defendants knew that lockdown procedures require children and teachers to stay quiet and hidden during lockdowns. Even so, Defendants had ample notice that victims remained alive in Classrooms 111 and 112 and that the Shooter was continuing his murderous rampage. For example, at 11:44 a.m., a girl in Classroom 112 said something, perhaps "Officers, help us." *Id.* at ¶ 5.160. The Shooter heard her, walked over to her and shot her. *Id.* All officers inside and outside the West building heard the shot, yet they did not breach the classroom and neutralize the Shooter. *Id.* at ¶ 5.161. Similarly, at 11:45 a.m., a law enforcement officer at the northwest entrance said that the Shooter was in a classroom "with kids." *Id.* at ¶ 5.162. Again, officers did not breach the classroom and neutralize the Shooter. At 12:10 p.m., a child in Classroom 112 took a teacher's phone and called 911. 2AC ¶ 5.207-5.208. The 911 call lasted approximately 16 minutes. *Id.* at 5.208.

Third, the TXDPS Defendants in particular bear special legal responsibility for the tragic failure at Robb Elementary School. TXDPS had ample resources, manpower, and expertise. By its own description, the TXDPS is the "premier law enforcement agency" in the State of Texas and "one of the finest in the nation." *Id.* at ¶ 5.104. Its budget for the 2022 fiscal year was over $1.6 billion. *Id.* The $435,270 allocated to security and monitoring services in the 2021-2022 UCISD budget was only 0.3% of the TXDPS budget. *Id.* During the active shooter incident, the TXDPS Defendants acted on their own authority. *Id.* at ¶ 5.253. They did not defer to Defendant Arredondo as incident commander, and he did not consider himself to have assumed incident command. *Id.*

At least 91 TXDPS officers responded to the active shooter incident at Robb Elementary School on May 24, 2024. *Id*. at ¶ 5.107. By 11:59 a.m., at least eight TXDPS officers had been in or were currently inside the West building. *Id*. at ¶ 5.187. Yet none of them took the initiative, as required by the ALERRT doctrine, to neutralize the Shooter as soon as possible.

TXDPS's role is to provide public safety capabilities that smaller law enforcement agencies in Texas lack. *Id.* ¶ 5.105. TXDPS's mandate includes responding to and taking responsibility over threats to public safety in Texas, including mass shootings. *Id.* This role is crucial when such threats occur in communities like Uvalde, with smaller police departments and fewer personnel and resources. *Id.* Accordingly, the attempt by TXDPS Defendants to disclaim authority or responsibility for neutralizing the Shooter is foreclosed by the mission of the TXDPS.

**B. Plaintiffs' Specific Allegations Establish the Liability of Each Defendant.**

Plaintiffs have also alleged sufficient facts to establish the liability of each Defendant:

- Defendant Garcia was a Texas Ranger Division ("TRD") Lieutenant with the TXDPS and was acting as such on May 24, 2022. *Id.* at ¶ 4.7. He supervised Defendant Kindell and was aware that the situation at Robb Elementary School was an active shooter incident. *Id.* at ¶¶ 5.133, 5.136. Defendant Garcia arrived on scene at approximately 12:35 p.m. and was repeatedly updated on the situation at Robb Elementary School from 11:38 a.m. onward. *Id.* at ¶ 4.8. For example, when Defendant Kindell first learned of the school shooting, he called Defendant Garcia. *Id.* at ¶ 5.134. When Defendant Kindell entered the west door of the West building at 11:57 a.m., he was on the phone with Defendant Garcia. *Id.* at ¶ 5.183. When Defendant Kindell heard from Officer Ruiz that his wife was dying inside Classroom 112, Defendant Kindell was on the phone with Defendant Garcia. *Id.* at ¶ 5.194. There were at least 19 phone calls between Defendant Kindell and Defendant Garcia, lasting approximately 25 minutes. *Id.* at ¶ 5.137. Defendant Garcia was regularly updated on the situation, acted in a supervisory capacity, and bears responsibility for the collective law enforcement failure on May 24. *Id.* at ¶ 5.250.

- Defendant Smith was a TRD Major with the TXDPS and was acting as such on May 24, 2022. *Id.* at ¶ 4.9. He supervised Defendant Garcia and was aware that the situation at Robb Elementary School was an active shooter incident. *Id.* at ¶¶ 5.134, 5.136. He was notified of the reported active shooting at approximately 11:40 a.m. and was repeatedly updated on the situation at Robb Elementary School from that time onward. *Id.* at ¶¶ 4.9, 5.134. Defendant Garcia regularly relayed the

information he received from Defendant Kindell to Defendant Smith. *Id.* at ¶ 5.137. Defendant Kindell also called Defendant Smith directly. *Id.* at ¶ 5.209. Defendant Smith was regularly updated on the situation, acted in a supervisory capacity, and bears responsibility for the collective law enforcement failure on May 24. *Id.* at ¶ 5.250.

- Defendant Simpson was a Texas Highway Patrol ("THP") Captain with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. *Id.* at ¶ 4.10. He acted in a supervisory capacity and was on scene well before the Shooter was neutralized. *Id.* He understood what different TXDPS personnel were doing in their response to the shooting. *Id.* at ¶ 5.252. He failed to follow the ALERRT doctrine to immediately neutralize the Shooter.

- Defendant Fernandez was a Lieutenant with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. *Id.* at ¶ 4.11. He was on scene at 12:34 p.m. or before and prior to his arrival on scene he received multiple updates regarding what was happening on scene. *Id.* He failed to follow the ALERRT doctrine to immediately neutralize the Shooter.

## V.   DEFENDANTS' REMAINING ARGUMENTS LACK MERIT.

### A.   Parent Plaintiffs Have Standing to Pursue Their Claims.

Defendants argue that the Parent Plaintiffs may not sue "in their individual capacities." Doc. 33, at 5; Doc. 28, at 8; Doc. 29, at 4-5. This argument misunderstands the nature of the Parent Plaintiffs' claims. As the Complaint makes clear (2AC ¶¶ 13.9 – 20.1), the Parent Plaintiffs seek damages under the Texas survivorship statute (Tex. Civ. Prac. & Rem. Code § 71.021) and wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002), which allow heirs and legal representatives to prosecute damages claims that at common law would have expired with the decedent. The Texas statutes simply determine who inherits the cause of action if the plaintiff dies. It is well established that state survivorship and wrongful death beneficiary statutes govern damages available under Section 1983 (absent preemption by federal law). *See* 42 U.S.C. § 1988(a); *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 423 (5th Cir. 2021) ("survival actions under § 1983 are governed by 42 U.S. § 1988, which directs the court to look to the law of the forum state") (citing *Robertson*). The

37

Texas statutes are fully consistent with Section 1983, which provides that defendants who violate the Constitution "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983; *see also* Tex. Civ. Prac. & Rem. Code § 71.004(a) (defining parents to be wrongful death beneficiaries of their children) & § 71.021(b) (authorizing personal representatives or heirs of decedents to pursue survival actions). As a case cited by one of the Defendants explains, "[a] parent may pursue claims for the violations of her minor child's constitutional rights in her capacity as a guardian." *Landry v. Cypress Fairbanks ISD*, 2018 WL 3436971, at *3 (S.D. Tex. July 17, 2018) (cited at Case No. 2:24-cv-00045, Doc. 39, at 4).

The TXDPS Defendants also argue that the parents of surviving children lack standing to seek damages for their own mental anguish. Doc. 32, at 3-5. But the Parent Plaintiffs are not garden-variety "bystanders," as Defendants mistakenly contend. *Id*. at 9. Rather, they have a direct familial relationship with the child victims, which is constitutionally protected. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ....") (internal citation omitted). The Supreme Court has consistently recognized that parents have fundamental constitutional rights to make decisions concerning the care, custody, and control of their children,[5] and the Fifth Circuit has repeatedly

---

[5] *See, e.g., Stanley*, 405 U.S. at 651 (1972) (citing "the interest of a parent in the companionship, care, custody, and management of his or her children"); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child").

granted standing to parents in the public school context.[6] Moreover, parents were tasered, knocked down, and straddled by officers. 2AC at ¶¶ 5.164-5.169, 7.9-7.10. Defendant Betancourt ordered TXDPS officers to maintain the perimeter, which was comprised of parents restrained from rescuing their children. *Id.* at ¶ 5.170. Defendant Kindell ordered that TXDPS send all troopers available to assist with crowd control. *Id.* at ¶ 5.198. All these actions represent separate constitutional violations directly targeting parents.

### B. The Statute of Limitations Does Not Bar Claims Against Defendants Garcia, Smith, Simpson and Fernandez

Defendants Garcia, Smith, Simpson, and Fernandez argue that claims against them are not timely because the relation-back principle of Fed. R. Civ. P. 15(c) does not apply where named defendants are substituted for "John Doe" defendants. Doc. 47, at 4-7.

But the doctrine of equitable tolling "preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995). The Fifth Circuit's decision in *Green v. Doe*, 260 F. App'x 717 (5th Cir. 2007), is instructive. In *Green*, the Fifth Circuit held that the plaintiff's § 1983 claim should have been equitably tolled "because the delay in determining the identity of 'John Doe' [was] not attributable to" the plaintiff's actions. *Id*. at 719. The Fifth Circuit expressly distinguished the authority on

---

[6] *Croft v. Perry*, 624 F.3d 157, 163 (5th Cir. 2010) (permitting minor children and their parents to proceed with an establishment clause challenge to the Texas Pledge Statute); *Doe v. Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001) ("The case for standing is made stronger when the plaintiffs are students and parents of students attending public schools, who enjoy a cluster of rights vis-a-vis their schools, and thus are not merely concerned bystanders.") (internal quotation marks and citation omitted); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th Cir. 2001) (parents had standing to challenge a policy that required them to fill out a questionnaire before their child could opt out of a uniform policy on religious grounds); *Does 1-7 v. Round Rock Indep. Sch. Dist.*, 540 F.Supp. 2d 735 (W.D. Tex. 2007) (parents of graduating students had standing to challenge a school district's policy of allowing graduating classes to vote on whether to have students say a prayer at the high school commencement ceremony).

which Defendants principally rely, *Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir. 1998), noting that in *Jacobsen,* "there was no justification for equitable tolling; the delays that plagued the case were the fault of the plaintiff." *Green*, 260 F. App'x at 719. In contrast, the Fifth Circuit in *Green* opined that the plaintiff's ability to name the "John Doe" defendant earlier was hampered by the States's "refusal to provide the name of the officer ultimately identified by the state." *Id.* at 720. That is exactly the situation here. *See also Carrillo Rivera v. ManpowerGroup US, Inc*., 2020 WL 5913832, at *8-9 (W.D. Tex. Oct. 6, 2020) (applying equitable tolling where defendant was in possession of identity of John Doe defendant and failed to disclose it in timely fashion); *Rogers v. Buchanan*, 2015 WL 5772203, at *7-9 (N.D. Tex. Aug. 4, 2015) (same).

Indeed, this case involves an even more compelling basis for equitable tolling, because the situation here is vastly more complex than in *Green*, and many of the would-be witnesses are dead. Ninety-one TXDPS officers responded to Robb Elementary School on May 24, 2022. FAC ¶ 19. Yet TXDPS (in contrast to the UPD) has successfully resisted public disclosure of most of its own officers' body camera footage, radio channel recordings, dispatch logs, and officer interviews and investigations. *Id.* at ¶ 20. TXDPS delivered a report to the Uvalde County District Attorney but has refused to make that report public. *Id.* at ¶ 353. Facing early public outrage about the law enforcement response, TXDPS initially promised complete transparency and disclosure, but it has since flip-flopped and broken its promise. *Id.* at ¶ 349-50. Plaintiffs have diligently sought to discover the identity of the unknown defendants. But the names of the highly resourced, highly trained TXDPS officers and commanders involved in the response have come to light only after the statute of limitations has run. *Id.* at ¶ 20. Accordingly, the doctrine of equitable tolling is amply warranted here.

Defendants suggest that Plaintiffs could have filed their complaint earlier (Doc. 52, at 6-7), but they fail to mention that TXDPS defendants sued in other cases arising from the shooting have taken the position that they will provide no discovery until their motions to dismiss are resolved. FAC ¶ 351. Indeed, Defendants reiterate that position here. Doc. 38, at 17; Doc. 41, at 17-18. Even if Plaintiffs had filed the complaint earlier, the Defendants would not have agreed to produce discovery until the resolution of the motions to dismiss.

Finally, Plaintiffs amended their complaint, added Defendants Garcia, Smith, Simpson, and Fernandez and served them with process all within the ninety days Plaintiffs had to serve the *original* complaint. *See* Fed. R. Civ. P. 15(c)(1)(C). This is an independent reason why these Defendants' limitations argument fails. And it underscores that there is no prejudice to these Defendants, another reason equitable tolling applies.

## CONCLUSION

Defendants' actions, documented in multiple reports commissioned because of the national outrage at their actions, subjected the children and teachers to terrible atrocities and deprived parents and family members of the right to come to their aid.  If Plaintiffs are denied the ability to proceed in this case, this generation of school children would effectively lose protection of the most basic constitutional rights to life and bodily integrity.  Section 1983 would be rendered an empty promise. This is a case that must proceed to trial.  Defendants' motions to dismiss should be denied.[7]

---

[7] To the extent any shortcomings exist in Plaintiffs' complaint, Plaintiffs request an opportunity to cure by amending their complaint.

Respectfully Submitted,

**THE PLAINTIFFS**,

/s/ Jamal Alsaffar
JAMAL ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
LAURIE HIGGINBOTHAM
lhigginbotham@nationaltriallaw.com
Texas State Bar #50511759
STEVEN HASPEL
shaspel@nationaltriallaw.com
Texas State Bar #24109983
NATIONAL TRIAL LAW
1114 Lost Creek Blvd, Ste. 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)

ALAN DALE HICKS
Dhicks-svc@thomasjhenrylaw.com
Texas State Bar #09575430
THOMAS J. HENRY INJURY
ATTORNEYS
5711 University Heights, Suite 101
San Antonio, TX 78249
(210) 656-1000 (o)
(361) 985-0601 (f)

Attorneys for Plaintiffs